FILED

06/30/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0357

DA 18-0357

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 172N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DAVID GARY BURTON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2012-16
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

      Leo J. Gallagher, Lewis and Clark County Attorney, Melissa Broch,
Deputy County Attorney, Helena, Montana

Submitted on Briefs:  April 15, 2020

Decided:  June 30, 2020

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Appellant David Gary Burton (Burton) appeals from the Findings of Fact, Conclusions of Law, and Order issued by the First Judicial District Court, Lewis and Clark County, denying Burton's Motion to Suppress. We affirm.

¶3 In December 2011, Lewis and Clark County deputies and Helena police officers were actively investigating a series of property offenses and other crimes occurring in Helena and the Helena Valley. Officers viewed videotapes and photographs captured at businesses in Helena and the Helena Valley starting December 17, 2011, with the goal of finding vehicles and/or persons shown at the businesses that may be involved in the crimes.

¶4 During the weekend prior to Monday, December 19, 2011, an investigation was conducted regarding the burglary of a residence in the Helena Valley, from which a credit card was stolen and subsequently used at Green Meadow Market. Photographic evidence supplied by Green Meadow Market shows the stolen credit card was used to buy gas for a dark pickup truck and a Ford Bronco. An officer who viewed the photographs of the vehicles recalled having seen a similar truck a week prior when

2

responding to a call at a residence somewhere in the Helena Valley, which led him to search the area for the vehicle. The officer located the truck at Burton's residence. On the morning of December 19, 2011, another officer, Deputy Chris Weiss (Weiss), went to Burton's house to observe a black Ford truck parked on the side of the residence. Weiss believed the truck "was a perfect match" to the truck depicted in the Green Meadow Market photograph, with "the same rims, same aluminum saddle, toolbox, [and] black extended cab." The residence was close to both Green Meadow Market and the house where the credit card was stolen. After determining that Burton was the registered owner of the truck, Weiss made contact with Burton's wife, Mindi Harvey (Harvey), at the residence sometime between 10:00 and 10:30 a.m. Harvey told Weiss that Burton was out running errands, so Weiss gave Harvey his business card and asked that Burton call Weiss upon returning.

¶5 Weiss then continued his investigation of the offenses by viewing videotape taken at Green Meadow Market; learning Burton was on probation and was supervised by probation officer Thomas Chvilicek (Chvilicek); and viewing Burton's driver's license photograph. Weiss directed two other deputies, Andrew Blythe (Blythe) and Eric Gilbertson (Gilbertson), to go keep an eye on Burton's truck and residence.

¶6 As Blythe and Gilbertson sat watching Burton's residence and the truck, they observed a white male arriving in a white sedan. The male exited the vehicle and walked toward the house. As Blythe and Gilbertson sat, watched, and listened, they heard dispatch notify Weiss that Burton was on the telephone in response to Weiss's request

3

that Burton call. Weiss did not take the call, as he was on the phone or radio with someone else. Shortly thereafter, the same male came back to the white sedan in the driveway of the residence, got in the vehicle, and left. As Weiss was pulling up to the residence behind Blythe and Gilbertson, Blythe reported to Weiss by radio, "That white vehicle that just passed us is going to be him." Weiss responded, "Go stop him."

¶7 Burton was stopped by use of top lights on Blythe and Gilbertson's vehicle, as well as Weiss's vehicle, which followed closely behind. Blythe approached the driver's side of the white sedan, asked for identification, received identification, and confirmed the driver was Burton. When Blythe told Burton that the police wanted to talk to him, Burton immediately stated that he had "called Chris Weiss back." Weiss then stepped forward and told Burton to return to his residence. During the stop, Gilbertson assumed the "cover" role by approaching Burton's vehicle from the rear passenger side where he observed license plates in plain view, lying on the rear passenger floorboard. Upon running the plate number and then the plate tab number affixed to the plates, Gilbertson learned that the plates were associated with a 1988 tan and blue Ford Bronco previously owned by Burton.

¶8 Burton drove the sedan back to the residence as Blythe, Gilbertson, and Weiss followed. At the residence, Burton and the deputies waited until Chvilicek, Burton's probation officer, arrived. Chvilicek had supervised Burton on probation since February or March 2011, and he knew Burton from prior contacts at the probation office. Burton was sentenced in January 2008 in Jefferson County for the offense of burglary

4

and had signed conditions of probation related to his sentence. Those conditions included search authority and a prohibition regarding possession or consumption of drugs and alcohol. On November 23, 2011, Burton provided the probation office with a monthly report listing his vehicles as a blue 1988 Ford Bronco, a black 1990 Ford 250 truck, and a white 2001 Nissan Altima. Chvilicek had personally seen Burton driving a white Nissan to the probation office, and the white sedan in which Burton was stopped on December 19, 2011, was a white 2001 Nissan.

¶9 After Chvilicek arrived at Burton's residence, Burton was read his *Miranda* rights, and invoked his right not to answer questions without an attorney present. Upon observing Burton, Chvilicek believed Burton was under the influence of drugs. Chvilicek ordered searches of the white sedan, the truck, and the residence. Large sums of cash and the old Bronco license plates were found in the white Nissan. Chvilicek ordered impoundment of Burton's black Ford truck and had the officers arrest Burton for probation violations. Once at the jail, a urinalysis revealed the presence of methamphetamines and tetrahydrocannabinol (THC) in Burton's system. Chvilicek returned to Burton's residence later that same day and again the next morning to conduct more thorough searches. Those searches revealed more evidence of Burton's involvement in various crimes.

¶10 In 2012, Burton was charged by information in Lewis and Clark County with Robbery and property offenses. An amended information filed by the State added charges for Aggravated Kidnapping, Sexual Intercourse Without Consent, Burglary, and

Theft. The State later filed a second amended information removing the Robbery count and modifying the Burglary counts because Burton was charged in a separate federal case with offenses relating to those crimes. The second amended information charged Burton with Deceptive Practices (Count 1); Burglary (Counts 2, 4, and 6); misdemeanor Theft (Counts 3 and 5); Aggravated Kidnapping (Count 7); Sexual Intercourse Without Consent (Count 8); and felony Theft (Counts 9 and 10, charged in the alternative). Upon Burton's request, the District Court severed Counts 6, 7, and 8 for purposes of trial.

¶11 In Burton's federal case, he moved to suppress evidence obtained by law enforcement as the result of what he claimed to be an unlawful investigative traffic stop. Based on the evidence presented, the federal district court held that the officers involved did not possess the level of reasonable suspicion necessary under the Fourth Amendment of the United States Constitution to justify an investigative stop of Burton's vehicle.

¶12 In District Court, following the federal district court's suppression ruling, Burton likewise moved to suppress evidence seized from the car he was driving when apprehended, and evidence seized from his house. Burton argued that the federal suppression order should be the basis for suppression of the same evidence in his state court trial. Burton did not identify any specific item or items of evidence that should be suppressed. Following an evidentiary hearing on Burton's motion to suppress, the District Court disagreed, holding that "Montana law and the facts of this case make wholesale suppression of evidence improper. Different items of evidence, discovered at

6

different times and in different ways, must be discussed in light of Fourth Amendment law to determine admissibility."

¶13    Burton appeals, arguing that the District Court erred in denying his motion to suppress evidence seized as a result of the investigative stop.  Burton also raises two issues for the first time on appeal: (1) that his probation officer lacked authority to seize his truck; and (2) that the District Court erred by failing to inform potential jurors of the statutory requirement that jurors be "a resident for at least 30 days of the state and of the . . . county[.]" Section 3-15-301(2), MCA.  Burton argues that the newly raised issues are structural, thereby warranting plain error review.  We first address Burton's arguments regarding the motion to suppress.

¶14    This Court reviews the denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those facts.  *State v. Dupree*, 2015 MT 103, ¶ 8, 378 Mont. 499, 346 P.3d 1114.  A court's determination that particularized suspicion exists is a question of fact reviewed for clear error.  *Dupree*, ¶ 8.  A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made.  *Dupree*, ¶ 8.

¶15    Both the Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens from unreasonable searches and seizures by requiring police officers and other government officials to obtain a validly

issued warrant prior to conducting a search or seizure of an individual. Absent the meeting of an exception to the warrant requirement, searches and seizures conducted without a valid warrant are considered per se unreasonable. *Dupree*, ¶ 19. One such exception to the warrant requirement is the investigative stop. Under § 46-5-401(1), MCA, law enforcement officers are required to have a "particularized suspicion" that the person in question "has committed, is committing, or is about to commit an offense" prior to effecting an investigative stop. To have particularized suspicion for an investigative stop, the officer must be possessed of: (1) objective data and articulable facts from which he or she can make certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense. *State v. Wagner*, 2013 MT 159, ¶ 10, 370 Mont. 381, 303 P.3d 285. Where a defendant has filed a motion challenging the legality of a stop, the State must show that there was objective data from which the officer could make inferences and deductions of some sort of criminal activity. *Wagner*, ¶ 10. Whether the officer had particularized suspicion is evaluated under the totality of the circumstances confronting the officer at the time of the stop, and requires consideration of the quantity or content of the information available to the officer and the quality or degree of reliability of that information. *Wagner*, ¶ 10.

¶16 In the present case, a review of the totality of the circumstances presented to the District Court shows that the officers who stopped Burton possessed the requisite particularized suspicion necessary to effectuate a valid investigative stop of Burton in the

8

white sedan. In contrast to the evidence presented in federal court on Burton's federal motion to suppress, the evidentiary hearing on Burton's state motion to suppress revealed vastly different, supplementary information. The first finding of the District Court provides:

> Comparison of the record created in this Court with the transcript of the federal proceedings establishes that the evidence before the federal court was vastly different, not because the witnesses testified differently, but because different questions were asked, different witnesses were called, different items of evidence were admitted, and different attorneys presented to the Court.

Upon our review of the record, we agree with the District Court that the evidence presented on Burton's motion to suppress reveals that the investigative stop was lawful and in accordance with Montana law.

¶17 On December 19, 2011, officers stopped Burton in his vehicle in an attempt to identify him. The stop was undisputedly of a nature "to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person[.]" Section 46-5-401(1), MCA. All the officers testified at the evidentiary hearing regarding their knowledge, observations, and inferences prior to the stop of Burton on December 19, 2011. As Blythe and Gilbertson were watching Burton's residence and the truck, they knew the suspect truck was registered to Burton and that Weiss wanted to talk to Burton. They knew from surveillance photographs that the person who used the stolen credit card at Green Meadow Market was a white male. They did not have a physical description of Burton or other knowledge of his appearance, but they saw that the driver of the white sedan was a white male. When Blythe stated on his radio to Weiss,

9

"That white vehicle that just passed us is going to be him," Blythe was expressing that the person in the white vehicle was the person who had arrived to, and was now leaving, Burton's residence. Weiss believed it to be a confirmation that it was Burton and ordered the stop of the vehicle. According to Weiss's testimony, had he not believed Blythe was confirming that Burton was driving, he would not have ordered the stop at that time. According to Gilbertson, had Weiss not ordered the stop, it would not have happened. Nonetheless, the officers would have followed the car and ultimately stopped Burton once they verified his identity. The misunderstanding of Blythe referring to "him" as the person Blythe and Gilbertson watched arrive at the residence in the white Nissan and potentially enter the residence before returning to the vehicle, while Weiss referred to "him" as Burton, does not negate the entirety of circumstances that established particularized suspicion.

¶18    Viewed objectively, the observations of all officers and the evidence compiled show that the stop of the driver of the white Nissan was based on the particularized suspicion that he was involved in the offenses being investigated. Section 46-5-401(1), MCA. Specifically, the white male arrived at the residence of probationer Burton, where Burton's truck was parked, and where Burton was expected to return after running errands. Burton's truck had been identified as a probable match to the one at Green Meadow Market, where a stolen credit card was used to purchase gas for the truck. The person arriving at Burton's residence was a white male, consistent with the photographic and videotape evidence taken at Green Meadow Market. A call was

10

made by Burton to Weiss during the short time period that the white male was at Burton's residence, where Weiss had left his card and requested that Burton call upon his return. These facts provided the objective basis for stopping the white Nissan driven by the white male, who did, in fact, turn out to be Burton.

¶19 Following the stop of Burton on December 19, 2011, officers promptly confirmed his identity and informed him of the reason for the stop, pursuant to § 46-5-401(1), MCA. At that point, Burton indicated his willingness to talk to the officers, stating that he had returned Weiss's phone call. Burton voluntarily drove, by himself, the short distance back to his residence with officers following. Given the evidence presented in the record, the investigative stop was made in accordance with Montana law, and the District Court was correct to deny Burton's motion to suppress.

¶20 Montana law also provides that evidence need not be suppressed if the evidence at issue would inevitably be discovered. *See State v. Pearson*, 2011 MT 55, ¶ 24, 359 Mont. 427, 251 P.3d 152 (providing that the doctrine of inevitable discovery is applied when investigatory procedures were already in progress and the lawful investigation eventually would have revealed the evidence obtained). "This Court has made clear that it must appear 'as certainly as night follows day' that the evidence would have been discovered without reference to the violation of the defendant's rights." *Pearson*, ¶ 24. In the present case, the evidence found in the white Nissan would have inevitably been found in the course of the investigation. It is undisputed that Burton's status as a probationer gave his probation officer broad authority to search, investigate,

11

and consider Burton's activities and belongings. The officers testified that, had the stop not occurred when it did, they would have continued to follow Burton until he stopped of his own accord and then approached. While it may have taken more time to contact Burton and the car, all evidence established that the investigation would have continued and both Burton and the car would have been located. The white Nissan was registered in Harvey's name, and it was listed on probation documents provided by Burton to Chvilicek. The evidence supports our conclusion that Burton would have been stopped, and his vehicle searched, through the course of the investigation.

¶21    Finally, we briefly address the two arguments raised by Burton for the first time on appeal. Burton argues two structural errors in the District Court proceedings: (1) that his probation officer lacked authority to seize his truck; and (2) that the District Court erred by failing to inform potential jurors of the statutory requirement that jurors be "a resident for at least 30 days of the state and of the . . . county[.]" Section 3-15-301(2), MCA. Burton urges this Court to apply plain error review to these issues regardless of Burton's failure to object in the proceedings below. We decline. This Court has consistently held that it generally will not consider issues raised for the first time on appeal. *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79.

¶22    As to the first argument, Burton has failed to establish that failure to review his claim about the seizure of his truck under the plain error doctrine would result in a fundamental miscarriage of justice. He concedes that officers lawfully searched his truck and home pursuant to his probation conditions. *See State v. Beaudry*, 282 Mont. 225,

12

228, 937 P.2d 459, 460-61 (1997) (A "probation officer may search a probationer's residence without a warrant so long as the officer has reasonable cause for the search."). The truck was in plain view of the officers and was implicated in a crime. The plain view doctrine permits the seizure of evidence "without a warrant—so long as the evidence can be plainly seen by the officer, the incriminating nature of the evidence is immediately apparent, and the officer has a lawful right of access to the evidence." *State v. Lewis*, 2007 MT 295, ¶ 24, 340 Mont. 10, 171 P.3d 731. The officers had the authority to access and search the truck, and the incriminating nature was immediately apparent because gas was purchased for the truck using a stolen credit card, and the tires on the truck appeared to match tire tracks left at the scene of a suspected burglary and kidnapping. Because the State had authority to search the truck and seize evidence in plain view, Burton failed to demonstrate that he would suffer a manifest miscarriage of justice if this Court declined to review his claim.

¶23 As to Burton's newly raised argument regarding the District Court's failure to discuss with potential jurors the statutory residence requirement, we likewise decline to conduct plain error review. Burton did not raise any objection to the District Court's omission of the residency requirement at trial; nor did Burton ask jurors questions about their residency during voir dire. Burton waived his challenge to the competency of the jury panel by failing to object in District Court. *Comm'r of Political Practices for Mont. v. Wittich*, 2017 MT 210, ¶ 61, 388 Mont. 347, 400 P.3d 735 ("We have long held that

the 'general rule is that, by failing to challenge or object, a party waives an irregularity in the impaneling of a jury.'").

¶24    We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions.  This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶25    Affirmed.

/S/ LAURIE McKINNON


We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR